We'll begin with McGonagall v. Kijakazi. Am I saying that right? I believe so. All right. Well, great. We'll just give me one second. That's Mr. Schneider, is it? Yes. Good morning and thank you. Mr. Schneider, you've reserved two minutes for rebuttal. I did. And I'd like to thank you for scheduling two of my cases on consecutive days. It helped me because I commute down from Plattsburgh, so I appreciate that courtesy. And I know in yesterday's argument there was some confusion about what substantial evidence. And I know you know what substantial evidence is, but I'd like to just review it quickly. Substantial evidence is the standard you use. And you review the record, the complete record below, from both sides. Because evidence that might be substantial standing alone might not be if you look at the other evidence. So in a case involving a car accident, one witness might say I saw the car stop at the red light. But if ten other witnesses say it went through and there was a video, then you'd probably say that one witness was not, that evidence was not substantial. Under those circumstances, that would be a scintilla. But on a summary judgment standard, maybe the one person alone would be enough to be, because you might show the other ten witnesses were biased or that the film was doctored or you couldn't see it well. So you, the standard below for the ALJ is a preponderance of the evidence. And then you review the decision to see if there is enough substantial evidence, something that a reasonable person, after looking at the whole record, would agree with the conclusion. And in this case, there is no substantial evidence that my client Mary McGonigal could work. Here, the, if you look at it from both sides, the ALJ cherry-picked a few pieces of evidence and then misconstrued them in finding she did not accurately testify about her limitations. And then he used that to say that the examining doctors were not credible. But her testimony was supported by the clinical evidence. All of the examining sources found that she showed anxiety, that she looked and acted depressed, that she had obsessive-compulsive disorder, very severe, that she was paranoid. And instead, the ALJ found, well, she went to a party. In fact, the testimony shows she dropped off her sister at a party and was very anxious about that. The ALJ found she was able to fly to Chicago. When she did go to Chicago, her family was trying to talk her out of it. And he found she regularly visited friends and family when one time the family visited and she was overwhelmed and stressed out. And another time she visited a niece having surgery and was also stressed out. But even if these three incidents were true, that's not enough to discredit somebody. Well, I mean, the ALJ found that she was able to prepare simple meals, drive, play video games, attend medical appointments, spend time with friends and family, take public transportation. Yes. So you dispute those things. That's not enough to find that performing simple activities occasionally is not enough to make somebody not credible. Because, in fact, why would she credibly say that and then be incredible about the things that she couldn't do? The therapist talked about her wearing the same shirt every day, about her conditions. But he relied on these mischaracterizations and misunderstandings without even asking her about them. So am I right in understanding that your argument is that the ALJ properly articulated his consideration of supportability and consistency factors but just wasn't supported by the evidence in the record? It was not supported by substantial evidence. Because these factoids, when, you know, this court is held in mental illness, you look at somebody's ups and downs. Is somebody able, the standard is, can you work every day on a full-time, consistent, sustained basis? And here the judge, the ALJ, did not correctly evaluate the medical evidence, which was very consistent. There was a treating nurse, a psychiatric nurse practitioner. And there was an examining psychologist who worked for the commissioner herself. And they agreed that she had severe limitations. Dr. Hartman, after examining her, he noted that she was distressed, she was crying, her posture was slouched, restless motor behavior, eye contact, very pressured speech, agitated, and was slow with the serial sevens showing diminished concentration. Based on his own exam, he found she had marked limitations in interacting with others and regulating her emotions and also moderate in concentration. And the treating psychiatric nurse practitioner, who has expertise in psychology, found she had severe or even was unable to work on a consistent basis. And they were consistent with each other. They were consistent with her testimony. If the ALJ felt there was an inconsistency, he could have asked them to explain it. But their own exams, the exam of psychiatric nurse practitioner Hackney, was very consistent. And the judge said, well, this is based on self-reports. Well, the only test given was the objective test was serial sevens. But the law is very clear that in psychiatry, you base it upon your examination, your clinical experience with the client. And never did anybody say she was malingering or that she was not consistent. Do I understand you also to say that the judge, in discounting parts of Dr. Hartman's opinions, that he overstated the record in relying on that she had attended a party, visited with family members, and regularly visited the friend weekly. That the party had a panic attack associated with it. She ended up maybe not even attending. And the visiting with family members and the friend weekly were very moderate, or very slight kinds of interactions. Yes. And if he had asked her, she would have. And the record itself showed that. The only, you know, it showed that she was afraid to drive her sister to the party and got very stressed out. And it was a few times she visited family. As a matter of law, those three events are not enough to discredit somebody. But it was not the three events that the ALJ relied upon. The ALJ also relied upon the very notes of the meetings and the fact that there were incidences of your client showing improvement. Yes. Oh, yes. Yeah, no, she had improvement. And that is the way that mental illness goes. But even when she improved for brief periods, then at the next time she would exhibit anxiety or OCD. Or there were even times where it was ambiguous. Where, you know, she said she was feeling good, but the therapist would note that she appeared anxious. But she was only 23 years old, 24 years old at the time of the application. Right. Is that right? 23 or 25, and I. . . Yes. There was one time, that's right, when she took oral contraceptives. And for a month or two, there was a period when she was not being treated. And then after that. . . And that helped her both with physical and mental problems. And then after that, again, it showed that her OCD and anxiety and paranoia continued and got worse. So you're basically saying that this record compelled a conclusion by the ALJ that this 24 or 25-year-old was incapacitated for life. Is that right? No, you don't have to show you're incapacitated for life. It's for one year. And often the ALJs will say, we'd like a review in two or three years. And if she is able to improve through therapy or medication, that would be great. So just for the period that is designated and without any import for the future. Excuse me? Just for the period that's designated, the coverage period. Right, and it's a minimum of one year. So if somebody breaks their leg and can't work for nine months, that is not a disability. But if you break your leg and it doesn't heal, but maybe in four years you'll get better, and then they can reexamine you. And Social Security regularly reexamines and reconsiders people to see if they're getting treated. So what is the strongest piece of evidence in the record that made this determination that she was not disabled during this period erroneous? What's the strongest? She had diagnoses of depression, anxiety, and OCD, but many people do. So I'm wondering, what is it that made this determination incorrect? Well, Dr. Hartman works for the commissioner, and he's their consultant. And he spent time with her. He noted her symptoms. He noted her history. And he gave an opinion that she had marked limitations in interacting with others and controlling her emotions and moderate in concentration. And based on that, she meets the listings. And there's nothing showing she didn't. Did Hartman make a finding that she had marked limitations in two of the Category B items? Hartman did. That was his examining opinion. And that was consistent and supported nurse practitioner hackneys. So there is no evidence. It's less than insubstantial. It's less than a scintilla that she was not disabled. All right. Well, you've reserved two minutes for rebuttal. We've gone over a bit, but we'll give you the two minutes for rebuttal after we hear from Ms. Carter. Good morning. Thank you, Your Honors. May it please the Court, Molly Carter for the acting commissioner. Could you speak up a little bit? Yes. Is that better? Thank you. We're trying to stand between the two, I think. Stereo. Okay. Thank you. This Court should affirm the ALJ's finding that Ms. McGonigal's mental impairments were not disabling within the meaning of the Social Security Act because the ALJ applied the appropriate legal standards and substantial evidence supports his findings. I want to begin with the point that was raised at the very end of the rebuttal. Dr. Hartman did not find that Ms. McGonigal was markedly limited in two of the Paragraph B criteria. He assessed marked limitations in interacting with others, which is one of those criteria, but he did not find marked limitations in any of the other three Paragraph B criteria. Moreover, the ALJ explained, and substantial evidence supports the explanation, that Dr. Hartman's assessment of marked limitations in interacting with others was not supported by his own exam findings and was not consistent with other evidence of Ms. McGonigal's interactions with others. A reasonable mind could accept the ALJ's reasoning that the fact that, despite some distress, Ms. McGonigal was cooperative with fair eye contact and participated fully in the consultative examination was inconsistent with marked limitations in interacting with others as well as... I was concerned that the ALJ didn't do a great job in explaining his reasoning ultimately. In talking about the RFC conclusions reached by Dr. Marks and Ferrin, he said they also supported the finding of not disabled. These are non-examining physicians, and their opinions don't, as a general matter, deserve as much consideration. But these are the most persuasive, particularly where there are other reasons to reach a similar conclusion. And he just said that kind of generically because it's explained throughout this decision. But that, to me, isn't really a reasoned analysis that explains why he is treating those opinions as more persuasive than the others who had examined, in fact, Ms. McGonigal and were more familiar with her case. Why should we accept that reasoning as sufficient articulation? I understand your concern, Your Honor. Primarily, we would argue that that point has been waived because it was not... Nothing about Drs. Marks and Ferrin were challenged before the district court, and nothing has been developed before this court. However, I do want to address your concern on the merits, of course. To the extent that the ALJ relied on Drs. Marks and Ferrin more than examining or treating sources, that is completely proper under the regulations, the new regulations that are applicable here. Under those regulations, the most important factors are supportability and consistency, relationship with the claimant. So I agree he's entitled to, but he didn't explain why. As to that point, you're absolutely correct, Your Honor, that the ALJ could have and perhaps should have done a better explanation. Our position is that under the case of Zabala v. Astor, which is cited in our brief, that an error such as this in articulation is harmless where application of the correct legal standards would lead to the same conclusion and where, as the court reasoned in Zabala, the evidence was not more favorable to the claimant than evidence that the ALJ did consider. So the... But doesn't the ALJ really have an independent obligation to explain this reasoning? And that would require us to assess the record ourselves as opposed to have the ALJ perform its function. So, I mean, I'm wondering why a remand wouldn't be appropriate to ask for a further articulation. Respectfully, Your Honor, our position is that remand would be, to quote language that the First Circuit uses sometimes, an empty exercise. The ALJ in, again, kind of taking a little shortcut, said that the Doctors Marks and Barron were persuasive for the other reasons described in the decision. And having done that sort of right between describing the evaluation of Dr. Hartman's opinion and Ms. Hackney's opinion. And in evaluating those opinions, emphasized the consistency or lack thereof, depending on the opinion, with the objective examination findings in the record, as well as with the daily activities and evidence of more than market, less than market limitations in social functioning. And so the ALJ did indicate what his reasoning was and that remand for the ALJ to simply repeat that analysis in the same paragraph as discussing Dr. Marks and Dr. Barron's opinions, while he should have done it in the first instance, that remand to do the whole thing over again simply to repeat that analysis would be a waste of government resources. So that is our position. Nevertheless, Dr. Marks and Barron's assessments do constitute among the substantial evidence supporting the mental RFC here. Along with that is Dr. Hartman's exam, which the ALJ explained was generally persuasive. And as I detailed, clearly explained why he was discounting the one piece of an opinion of market limitations in interacting with others and regulating emotions. The ALJ also properly and supportably explained why he found Ms. Hackney's opinion only partially persuasive. He explained, again, that portions of it indicated only mild to moderate mental limitations, and that was consistent with Dr. Hartman's exam findings, as well as the treatment notes in the record, which consistently noted, as the ALJ emphasized, consistently showed that Ms. McGonigal was attentive, communicative. She made good eye contact. She had no thought disorder. She had normal cognitive functioning and insight, intact judgment, and no behavioral abnormalities. Let me ask you about your views about the opinion of nurse practitioner Hackney. I understood you to be arguing that her views should be discounted because they weren't based on medical evidence, but I wasn't really clear what you were referring to. Could you describe your position? As the ALJ explained, in general, Ms. Hackney's opinion was not well supported. She did not provide a lot of explanation, despite being asked at every point in the form to explain the limitations she was indicating. And that explanation on the form specifically said, asked that she include clinical findings. She never included any clinical findings. So what would be an example of a clinical finding that would have satisfied that standard? So the regulations define objective medical evidence as to include signs and laboratory findings, which are images that are more susceptible to… But of course, in a mental health setting. Certainly. And then it goes on. I'm referring to the regulations at section 404.1502, subsection G, defines signs as one or more anatomical, physiological, or psychological abnormalities that can be observed apart from your statement. So something that's different than what the claimant herself is reporting. It goes on to define psychiatric signs specifically as medically demonstrable phenomena that indicate specific psychological abnormalities. For example, abnormalities of behavior, mood, thought, memory, orientation, development, or perception. And so those are the exact kinds of things that the ALJ said consistently. Her treatment notes showed she was attentive. She was communicative. Her thinking was logical and normal. Her cognitive functioning was normal. Her insight, her judgment were normal and intact, and she had no behavioral abnormalities. So that completely satisfies the definition of objective medical evidence that does apply in a mental impairment. With the observations that she was doing a not very good job of caring for herself and was not going out, was just taking care of her cat and was not, in some circumstances, not well-groomed, would those qualify as satisfying that standard? As far as observations regarding grooming, there was, I believe, only one indication that Ms. McGonigal's hair was unwashed, but Ms. Hackney and her colleague, Ms. Krobach, repeatedly just referred to her as casually groomed, which certainly wouldn't compel a finding that she wasn't properly. Sorry, I didn't catch that. They referred to her as casually groomed, which certainly wouldn't compel a finding that she wasn't properly caring for herself. And as far as the reports that she wasn't going out a lot, that alone, again, doesn't compel a finding that she was completely unable to do so. Well, those are self-reports, anyway. Those are not objective. Exactly, Your Honor. And she did regularly, as the ALJ noted, among other substantial evidence, she did regularly present for treatment with Ms. Hackney and, again, her colleague, Ms. Krobach, as well as her primary care provider as needed and things like that. So it's not true that she never went anywhere. She also reported twice that she spent time with a friend once a week. She reported that at pages 296 and pages 689. Difficulty, unable at times to bathe due to OCD symptoms? That's something. Again, that's not reflected in the treatment notes. The observation is simply that she's casually groomed. So as compared, the subjective reports as compared to what was actually noted in the treatment notes, it's just not supported. Thank you. All right. Thank you, Ms. Carter. Thank you, Your Honors. We'll now hear from Mr. Schneider for two minutes of rebuttal. Yes, thank you. And I may be relying on my own typo in saying she had marked difficulties in two areas. It's at 689 of the record, and if it doesn't say that, that is my typo, but I'm relying on my brief to show what, and I didn't bring the record with me. In any event, it's not, there's no harmless error here in discounting and relying on the non-examining consultant who relied upon the foundational reports of Dr. Hartman and Nurse Practitioner Hackney. Certainly Dr. Hartman and Nurse Practitioner Hackney relied on their own examinations. Nurse Practitioner Hackney treated Ms. McGonigal many, many times. Well, there's no question about that, but it does seem that most of their findings are based on self-reporting as opposed to more objective facts observed by the examining. Yeah, and under the precedents, they have to rely on self-reports. That's part of psychology. Nobody found she was malingering or exaggerating or lying about any of this. I mean, the whole field of psychology relies on people reporting things, and Nurse Practitioner Hackney didn't find that any of that seemed inconsistent, and those reports were consistent with her testimony. There's nothing showing that she did suffer from OCD and had to go through these routines. Wearing the same shirt to every exam certainly was objective evidence that she didn't care for herself. What besides wearing the same shirt and the fact that her dress supports the clinical findings? Yeah, she appeared anxious. She was sad. Her demeanor was sad and depressed almost every time she went to see them. I mean, that's why we had in the past the treating rule, treating physician rule, and we still have to look at Nurse Hackney was a specialist in psychology. She saw her many times. She prescribed medication based on these reports. So if we throw out self-reports as a basis for psychological— I don't think that's the argument to throw out the self-reports. I think the argument is that the self-reports can't be sufficient in and of itself, and you don't dispute that. Correct. Right, but we had her demeanor, her speech, her acting agitated in front of Hartman. She was slouched. She had problems. You know, there's plenty of behavioral activity in front of the treating sources, and I'd also like to bring up that my client, the day after this decision, was found disabled by another ALJ who found that Nurse Practitioner Hackney's—the same report was very persuasive, and that's not at all controlling on you, but it shows that there's a lot of evidence supporting Nurse Hackney's opinions. But there was nothing in the medical records contradicting or not supporting my client's testimony, Dr. Hartman's testimony, and Nurse Practitioner Hackney's opinions, and there is not substantial evidence, and it's wrong as a matter of law. So I ask you to reverse and remand for benefits, because looking at this record, I think there's only one conclusion that a court or a reasonable person could draw. Thank you. Well, thank you, Mr. Schneider and Ms. Carter. We will reserve decision.